**UNITED STATES of America**
**Plaintiff—Appellee,**

v.

**Darrick Eugene MCALLISTER**
**Defendant—Appellant.**

No. 00–6579.

United States Court of Appeals,
Sixth Circuit.

March 14, 2002.

Before BOGGS and MOORE, Circuit Judges; RUSSELL, District Judge.*

RUSSELL, District Judge.

In the early morning hours of October 24, 1999, Appellant Darrick Eugene McAllister and co-defendant Malik First Born Allah Farrad were arrested in Knoxville, Tennessee by officers of the Knoxville Po-

---

* Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

lice Department. The two were arrested because they were in possession of two loaded Ruger handguns, one with an obliterated serial number, and three full ammunition magazines. Defendant McAllister sought to suppress this evidence, claiming that it had been obtained in violation of his Fourth Amendment rights. The magistrate judge filed a Report and Recommendation that advocated denying McAllister's motion, which the district court subsequently adopted. After his motion to suppress was denied, McAllister entered a conditional guilty plea and has now timely appealed the denial of his suppression motion. Because we agree with the magistrate and district court that the stop and search both complied with the Fourth Amendment, we AFFIRM.

## BACKGROUND

Some time prior to October 23, 1999, three or four African–American males wearing dark clothing had perpetrated a series of robberies in the general area of Magnolia Avenue in Knoxville, Tennessee. The week before McAllister and Farrad's October 24 arrest, these darkly dressed black males robbed three individuals who had just left the Conversation Pit, a nightclub on Magnolia Avenue. A few nights before the pair's arrest, four black males had robbed a man six blocks from the Conversation Pit. The Knoxville Police Department knew of these robberies, but had yet to catch the perpetrators.

At approximately 8:30 p.m. on October 23, 1999, Officer Susan Coker answered a call to the Little John Package Store, a liquor store in the 1900 block of Magnolia Avenue. Officer Coker was dispatched to the store because an employee had been told by a customer that four African–American males were planning to rob the store or its patrons sometime over the weekend. Officer Coker relayed the infor-

mation about the potential robbery to officers Brandon Sharp and Michael Booker, the two officers patrolling the area of Knoxville including the Little John Package Store that night.

During that same shift, at approximately 2:23 a.m. on October 24, 1999, police dispatch reported receiving a call from the Conversation Pit, which is located immediately adjacent to the Little John Package Store. In that call, the owner of the Conversation Pit reported that he had received information (apparently from one or more of his patrons) that his establishment or his customers would be robbed the night of October 23 or the early morning of October 24. The police dispatcher relayed this information to its officers, two of whom, Officers Coker and Sharp, responded to the call.

According to the officers, they went to the Conversation Pit primarily to ensure that there would be no robbery. Upon arriving at the nightclub, Officer Coker went inside to talk to the proprietor. Officer Sharp parked his vehicle on the street in front of the Conversation Pit and went across the street to the Save–Way Food Store parking lot, where club patrons often park. As Officer Sharp walked into the Save–Way lot, he noticed Darrick McAllister and Malik Farrad, both African–American males, who began walking away from him. McAllister was wearing a dark blue sweatshirt, a black vest, black slacks, and a black hat. Farrad was wearing a gray sweatsuit and skull cap.

Officer Sharp, who is also black, testified that the two defendants appeared to be acting nervously and seemed to be trying to avoid him. They repeatedly cast furtive glances over their shoulders, as if keeping a constant check on his whereabouts. Officer Sharp, who had been a patrol officer unsupervised for approximately four months, stated that he found the defen-

dants' behavior unusual and that it was "common of someone trying to get away from [him]." (J.A. 145.)

Officer Sharp testified that he got a good look at both defendants as they walked away, that they were not hiding their faces from him, that he made eye contact with them, and that they were aware that he had seen them. The pair soon reached their car, which had been a few feet away from McAllister and Farrad when Officer Sharp first spotted them. Appellant McAllister entered the driver's side of the green Pontiac Bonneville. Farrad approached the passenger side of the car, but went between two bread trucks when he saw Sharp walking in their direction. Although Officer Sharp saw Farrad peeking out from behind the front end of one of the trucks, Sharp lost sight of Farrad as he continued toward the two defendants.

In the meantime, Officer Booker arrived in his police cruiser and parked on Magnolia Avenue. Officer Booker observed Officer Sharp walking across the parking lot and saw McAllister and Farrad walking away. He saw the two defendants separate, and it appeared to Officer Booker that Farrad was trying to hide from Officer Sharp behind the bread trucks. Officer Booker got out of his car and paralleled Officer Sharp's course. From his position, Officer Booker could see Appellant McAllister sitting in the vehicle and watching Officer Sharp. He also could see Farrad, who appeared to be hiding from Officer Sharp. Officer Sharp asked Officer Booker if he had seen a man "hiding" behind the trucks, and Booker responded that he had.

By this time, Farrad had emerged from behind the trucks and gotten in the pas-

senger side of the Bonneville. McAllister began backing the car out of its parking space as the officers neared the vehicle. The officers saw that Farrad had slid far down in the passenger seat below the edge of the window and was peering up over his shoulder back toward the officers. Officer Sharp walked to the passenger side of the vehicle as the occupants locked the car doors. Officer Sharp went to the passenger side of the vehicle to talk to Farrad, and Officer Booker went to the driver's side to talk with McAllister.

Because the passenger window apparently was inoperable, Mr. Farrad opened his car door. When he did so, Officer Sharp saw a chrome-like object that appeared to be a gun lying under the passenger seat. Sharp also claims to have smelled the odor of marijuana coming from the car. Officer Booker was unsure whether he smelled marijuana, but said he might have detected a faint odor. He qualified this latter statement by admitting that he was unsure whether it came from the vehicle.[1] Officer Booker later stated that he did not smell marijuana.

Officer Sharp told Officer Booker about the chrome weapon-like object, and the officers got McAllister and Farrad out of the car and called for a canine unit. The drug dog, which arrived within five to ten minutes, worked his way around the closed vehicle and alerted on the driver's door. After this happened, the officers opened the door to allow the dog to search the interior. The officers viewed a handgun magazine wedged between the door handle and panel. Inside the car, the dog alerted on the center dash, near the ashtray. A vehicle search revealed that the chrome object originally observed by Officer Sharp

---

1. Officer Booker claimed uncertainty because "a lot of people smoke marijuana in that parking lot." (J.A. 213.)

was not a weapon; however, a loaded 9mm Ruger handgun was found beneath the driver's seat and another 9 mm Ruger was found between the driver's and passenger's seat, accessible only to the passenger. Additional loaded handgun magazines were also found in the car. No narcotics were found in the vehicle, but a search of McAllister uncovered marijuana in his pocket.

In the instant appeal, McAllister challenges both the initial stop and the subsequent vehicle search. Specifically, he contends that Officers Sharp and Booker were unjustified in stopping the vehicle and that Officer Sharp's claim of smelling marijuana lacked credibility such that the vehicle search was without probable cause.

## DISCUSSION

This Court reviews the lower court's conclusions of law de novo and its factual determinations for clear error. *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir.1999).

### A. The Initial Stop

As the Supreme Court recently stated, "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, —— U.S. ——, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002). In these brief investigatory stops, the Fourth Amendment is satisfied where the officer has a reasonable suspicion supported by specific and articulable facts, together with rational inferences therefrom, that criminal activity may be afoot.

*Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1095, 108 L.Ed.2d 276 (1990); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For an officer to have sufficient reasonable suspicion, he must have "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Reasonable suspicion is based on the totality of the circumstances, which requires a reviewing court to examine relevant factors as a collective whole rather than independent pieces. *Arvizu*, —— U.S. at ——, 122 S.Ct. at 751. Although a police officer's mere "hunch" is insufficient to justify a stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.*

Here, Officers Sharp and Booker, in addition to the two anonymous tips,[2] based their stop on (1) the recent string of nearby robberies, (2) the defendants' retreat with furtive glances toward an approaching Officer Sharp, (3) Farrad's excursion behind the two bread trucks, (4) Officer Booker's observation that Farrad was hiding from Officer Sharp, and (5) the fact that Farrad, once in the vehicle, continued to try to hide from the officers as McAllister started to drive away.

Appellant offers the unpublished case of *United States v. Lewis*, 208 F.3d 216 (table), 2000 WL 263340 (6th Cir. Feb.29, 2000), in support of his appeal. That case, however, adds no weight to McAllister's contention. In *Lewis*, four experienced police officers, in conducting undercover drug work in problem areas, drove

---

2. The district court refused to consider in its analysis of reasonable suspicion the two anonymous tips, finding that the tips were not reliable by themselves to justify an investigatory stop. *See Florida v. J.L.*, 529 U.S. 266, 268, 120 S.Ct. 1325, 1377, 146 L.Ed.2d 254 (2000) (anonymous tip that a person is carrying a gun, without more, is insufficient to justify stop).

through a parking lot of an apartment development and observed two juveniles acting suspiciously as "decoys." The officers then spotted four males exiting an automobile who appeared to be acting "suspiciously" and "looked nervous and frightened as if they desired to flee." One of the four was drinking a beer and appeared to be unsteady on his feet. The police officers approached, suspecting "drug activity." The Sixth Circuit panel found that these circumstances justified a *Terry* investigatory stop.

While the appearance of intoxication adds an element not present here, the *Lewis* case nonetheless proves helpful. The observed conduct—representing little more than nervousness—is significantly less than the actual retreat of McAllister and Farrad, yet this conduct, in combination with the "decoys" and one individual's seeming unsteadiness, justified the stop.

Similarly, in *United States v. Harris,* 192 F.3d 580 (6th Cir.1999), a police officer set up surveillance on a neighborhood street in response to citizen complaints of drug trafficking. *Id.* at 583–84. The officer observed the defendant walking back and forth along Arthur Avenue, the street that the officer had been watching. *Id.* at 584. He was walking "erratically," causing the officer to suspect alcohol intoxication. *Id.* At one point, the defendant bent down and removed something from his sock or shoe, which he appeared to cup in his hand. *Id.* This defendant also had one pant leg rolled up, which the officer's experience told him was a sign that the defendant had drugs for sale. *Id.* As the officer exited his vehicle to talk to the defendant, the defendant walked up the steps to one of the houses on Arthur Avenue. *Id.* When the officer neared, the defendant came back down the steps toward him. *Id.* Observing that a series of acts, each of which is consistent with innocent behavior,

may nevertheless amount to reasonable suspicion when viewed together, *id.,* the court determined that the stop was proper. *Id.* at 583–85.

The recent Supreme Court case of *United States v. Arvizu, supra,* is instructive. There, the Court upheld an investigative stop by a border patrol agent. The defendants were traveling on an unpaved side road commonly used by smugglers. *Arvizu,* —— U.S. at ——, 122 S.Ct. at 748. They were driving a minivan of the type frequently used by smugglers. *Id.* at 749. The officer observed that the driver's posture was rigid and that he would not look at the officer. *Id.* As the border patrol agent drove behind the van, the children in the back seat waved in a continuous mechanical manner. *Id.* The van turned off of the dirt road onto another unpaved road that was the last possible diversion before they would have been subject to a checkpoint stop. *Id.*

The Court emphasized that courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* at 751. A court should not adopt a "divide-and-conquer" analysis and look at each factor of suspicion in isolation. *Id.*

■ The Supreme Court held that, looking at the totality of the circumstances in that case, the officer had reasonable suspicion to conduct an investigatory stop. *Id.* at 752, 122 S.Ct. 744. The same is true in the instant case. Farrad and McAllister walked away from Officer Sharp as he approached, casting repeated sidelong glances back at him as they retreated. Furthermore, Farrad seemed to hide from Officer Sharp both before and after he got in McAllister's Bonneville. Clearly, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow,* 528 U.S. 119, 124, 120

S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). The seemingly evasive behavior of these two defendants tends to evoke a reasonable suspicion that criminal activity was afoot. In combination with the officers' knowledge of recent robberies in the area and the two (albeit unreliable) anonymous tips, the defendants' conduct creates sufficient justification for an investigatory stop.[3] *See Copeland v. State,* 756 So.2d 180 (Fla.App.2000) (stop justified where defendant backed away from approaching officers, looking nervous, and hid behind someone else).

## B. Probable Cause to Search the Vehicle

Appellant next disputes the district court's factual determination that Officer Sharp's account of smelling marijuana coming from the vehicle was credible. In support of this argument, he points to various testimonial inconsistencies, including an apparent disagreement between Sharp and Booker as to whether the smell was present. Appellant's argument must fail. Even assuming clear error in the magistrate's determination that Officer Sharp's testimony of smelling marijuana was credible, *see Hamilton v. Carell,* 243 F.3d 992, 997–98 (6th Cir.2001) (credibility assessments will not be overturned absent clear error), the search of McAllister's vehicle was not without probable cause.

■■■ Like the determination of reasonable suspicion to stop, an examination of probable cause to search requires evaluating the totality of the circumstances.

*Smith v. Thornburg,* 136 F.3d 1070, 1074–75 (6th Cir.1998). When Farrad opened his door to talk to Officer Sharp pursuant to Sharp and Booker's legitimate investigatory stop, Sharp saw a chrome object that appeared to be a weapon under Farrad's seat. This apparent weapon, plainly visible to Officer Sharp after Farrad voluntarily opened the passenger door, gave the officers justification for searching the vehicle. *United States v. Webb,* 533 F.2d 391, 394 (8th Cir.1976) (police officer who saw what appeared to be a weapon in plain view during a lawful stop had probable cause to search the vehicle); *see Michigan v. Long,* 463 U.S. 1032, 1049–52, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (search of car's passenger compartment permissible if police have a reasonable suspicion that the suspect is dangerous and may gain immediate control of weapons, even if suspect under police control at search). Further, it was constitutionally permissible in these circumstances for the officers to summon the canine unit to sniff the car's exterior, *United States v. Ortega–Ramos,* 56 F.3d 65 (table), 1995 WL 314889, at *3 (6th Cir. May 23, 1995) (15–minute wait for drug dog after initial vehicle stop was not unlawful); *United States v. Jeffus,* 22 F.3d 554, 557 (4th Cir.1994) (15–minute wait for drug dog to arrive at traffic stop not unreasonable); *see United States v. Avery,* 137 F.3d 343, 350–51 (6th Cir.1997) (25–minute detention while waiting for drug-sniffing dog was reasonable); *United States v. Knox,* 839 F.2d 285, 290 (6th Cir.1988) (30–minute wait permissible),[4]

---

**3.** While Appellant challenges Sharp and Booker's experience as police officers, this is but one factor in the totality analysis, and is not determinative. *See Arvizu,* —— U.S. at ——, 122 S.Ct. at 751. The entire series of events must be viewed through the lens of the officers' experience, but their purported inexperience does not, by itself, make their suspicions unreasonable. Here, the other relevant factors, even with the officers' relative inex-

perience, provide the reasonable suspicion necessary for a constitutional stop.

**4.** Because a drug dog sniff is not a Fourth Amendment search, probable cause was not a necessary prerequisite to a canine sniff of the vehicle's exterior. *United States v. Holloman,* 113 F.3d 192, 194 (11th Cir.1997); *see United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983).

and that exterior sniff provided probable cause to search the vehicle. *United States v. Hill,* 195 F.3d 258, 273 (6th Cir.1999).

Certainly the chrome weapon-like object and the dog sniff—each independently sufficient to supply probable cause to search the vehicle—together furnished probable cause for the search of McAllister's vehicle.

### CONCLUSION

In summary, the district court properly found that Officers Sharp and Booker had sufficient reasonable suspicion to stop McAllister and Farrad as they attempted to drive away and properly found that the officers had probable cause to search the vehicle. Accordingly, the district court did not err in denying McAllister's motion to suppress. We therefore AFFIRM the district court's order.