United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 8, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 02-50671
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENRIQUE NEUFELD-NEUFELD, a/k/a Alan Rosaire Boutin,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before JONES and CLEMENT, Circuit Judges, and FELDMAN, District Judge.[*]

EDITH BROWN CLEMENT, Circuit Judge:

Appellant Enrique Neufeld-Neufeld ("Neufeld") asserts on appeal that the district court erred

in denying his motion to suppress evidence seized following an allegedly unlawful vehicle stop. We

AFFIRM.

**I. FACTS AND PROCEEDINGS**

Around noon on May 18, 2001, Border Patrol Agents Rodolfo Garcia ("Garcia")[1] and David

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[1] Garcia had thirteen years of experience as a Border Patrol Agent.

1

Marshall ("Marshall")[2] (collectively, "the Agents") were traveling south on U.S. Highway 385

through Big Bend National Park ("Big Bend").[3] The Agents were driving separate vehicles–Garcia

---

[2] Marshall had one and one-half years of experience as a Border Patrol Agent.

[3] Big Bend is situated on the U.S.-Mexico border in the Pecos Division of the Western District of Texas. Big Bend covers approximately 801,000 acres of land, all of which is located within 50 miles of the Mexican border. Judge Royal Ferguson of the Western District of Texas aptly described this area in testimony before Congress:

> The Pecos Division of the Western District of Texas encompasses ten of the eleven most western counties of Texas, covering 30,450 square miles of territory, almost twelve percent of the total land area of Texas. One of those ten counties, Brewster, is larger than the state of Connecticut. The Pecos Division shares 430 miles of international boundary along the Rio Grande with Mexico, representing one-fifth of the 2,000 mile United States/Mexico border. There are only two authorized ports of entry on this stretch of border, one in Presidio, Texas, and one in Fort Hancock, Texas. The Presidio port is permanently staffed, 24 hours a day; the Fort Hancock is permanently staffed, but only for 15 hours a day.
> Much of the territory in the Pecos Division is rugged, remote and inhospitable. The region, if not desert, is certainly semi-arid and barren. The legendary Rio Grande is not much of a border, for it is not much of a river, and certainly not a grand one. The fourth largest national park in the lower 48 States, the Big Bend National Park, is located in the Pecos Division. There are not many people in the Pecos Division. The combined population of all ten counties is less than 79,000 people.
> To travel anywhere in the Pecos Division of the Western District of Texas, one must travel far and through a sparsely populated land. The three main highways that run north from the Mexican border are Highway 67 to Marfa, sixty miles from the border; Highway 118 to Alpine, ninety-seven miles from the border; and Highway 385 to Marathon, sixty-six miles from the border. The Border Patrol maintains checkpoints on all three highways: the one on Highway 67 is five miles south of Marfa, the one on Highway 118 is fourteen miles south of Alpine and the one on Highway 385 is six and one-half miles south of Marathon. While these checkpoints are permanent, they are not staffed on a regular basis, because of lack of manpower.

*Protecting the Southwest Border: Hearing Before the Subcomm. on Criminal Justice, Drug Policy, and Human Res., House Comm. on Gov't Reform*, 105th Cong. (June 30, 2000) (statement of Judge Royal Ferguson, Western District of Texas) [hereinafter Judge Ferguson Testimony].

in front in an unmarked vehicle and Marshall a quarter-mile behind in a marked patrol car. The Agents were planning on joining their colleagues in searching for a marijuana cache that had been reported by recently apprehended illegal immigrants.

Two miles from their destination and thirty-five miles from the U.S.-Mexico border,[4] Garcia and Marshall encountered a red-and-white Ford pickup truck ("the pickup") traveling north on U.S. Highway 385 in Big Bend.[5] At the time of the encounter, the Agents noticed that the pickup, which had Texas license plates and a Big Bend permit attached to its windshield, was driven by a young white male (Neufeld) traveling alone. The pickup passed Garcia's unmarked vehicle without event, but upon sight of Marshall's marked patrol car, the pickup's "nose dove down," which indicated that Neufeld had "hit the brakes really hard." Marshall found this to be suspicious because the pickup did not appear to be speeding. Neufeld also acted suspiciously by failing to acknowledge the marked patrol car and by sitting stiffly and staring straight ahead, with his hands in "the 10-2 position [that is typically taught] in driver's school."

Marshall radioed Garcia and confirmed that neither agent was familiar with the pickup or its driver. Based on their suspicions, Marshall and Garcia turned around and began following the pickup. Marshall conducted a registration check that indicated the pickup belonged to a Fort Worth couple. Marshall found it strange that a pickup registered to a couple would only have one occupant and that

---

[4] The record indicates that the encounter took place about eighteen miles north of Panther Junction, the headquarters of the National Park Service ("NPS") in Big Bend.

[5] This Court described U.S. Highway 385 as both "a notorious smuggling route" (for illegal aliens and narcotics) and "a major highway used by thousands of visitors to Big Bend National Park." *United States v. Jacquinot*, 258 F.3d 423, 428 (5th Cir. 2001).

3

a pickup registered in Fort Worth would be in Big Bend. Based on all the information available to them, Marshall and Garcia stopped the pickup.

After the Agents stopped the pickup, they quickly deduced that it likely contained contraband. First, Marshall noted the strong smell of gasoline as he approached the pickup, which indicated that the gas tank either had been tampered with or had a leak.[6] Garcia examined the undercarriage of the pickup and found tool marks on the gas tank, which indicated that something was possibly hidden inside. Second, Garcia found mud on the undercarriage and wheel wells, which suggested that Neufeld may have driven over a low-water section of the Rio Grande. Third, the Agents asked Neufeld if he had been to Mexico, and he said "no" even though he had a Mexican driver's license and spoke in Spanish and broken English.[7] Neufeld claimed Canadian citizenship and produced a Canadian birth certificate to that effect. Fourth, Neufeld told the Agents that he was driving from Presidio, Texas, to Canada, but he had no luggage except for a duffel bag. When he Agents asked him where he was going, Neufeld simply said "Canada."

Neufeld agreed to a canine inspection, which indicated the presence of narcotics. A search of the gas tank revealed metal boxes containing marijuana. Neufeld was charged with possession of marijuana with intent to distribute. He filed a motion to suppress, which was referred to a magistrate

---

[6] Smugglers sometimes tamper with their gas tanks in order to conceal illegal narcotics therein.

[7] There seems to be some confusion as to whether the driver was indicating that he had *never* been to Mexico or that he had not been to Mexico *recently*. The former was clearly false, but the latter may have been true because the Customs Service indicated that the pickup had not crossed the border within the past 72 hours. The Agents interpreted the driver's statement as indicating that he had never been to Mexico, which seemed implausible in light of the evidence.

judge. After a hearing, the magistrate judge recommended that the motion be denied. Neufeld objected to the magistrate judge's recommendation. After conducting a *de novo* review and hearing Neufeld's objections, the district court adopted the magistrate judge's report and recommendation and denied the motion to suppress and subsequent motion to reconsider. Neufeld pleaded guilty, but reserved the right to appeal the denial of his motion to suppress. He was sentenced to 41 months imprisonment, three years supervised release, and other terms and conditions. Neufeld filed a timely appeal. On appeal, Neufeld only challenges the initial vehicle stop, not the subsequent search and seizure.

## II. STANDARD OF REVIEW

In reviewing a district court's ruling on a motion to suppress, this Court accepts findings of fact unless clearly erroneous but reviews *de novo* the ultimate conclusion as to the constitutionality of the law-enforcement action, "including whether there was reasonable suspicion for a stop." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (citing *United States v. Shipley*, 963 F.2d 56, 58 (5th Cir. 1992)).

## III. DISCUSSION

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Although the protections of the Fourth Amendment extend to investigatory stops, "the level of suspicion required for [an investigatory or] *Terry* stop is obviously less demanding than that

5

for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Id.*

The "somewhat abstract" and "elusive" nature of the reasonable suspicion standard makes it impossible to create "a neat set of legal rules" of what constitutes reasonable suspicion, but this very elusiveness provides courts with the flexibility needed to make case-specific determinations based on particularized facts. *Arvizu*, 534 U.S. at 274-75 (citing *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996) and *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *United States v. Nelson*, 284 F.3d 472, 484 (3rd Cir. 2002); *United States v. Santiago Vega*, 228 F. Supp. 2d 2, 7 (D. P.R. 2002) ("[P]er se rules are inappropriate in the Fourth Amendment context.").

The application of the reasonable suspicion standard requires the consideration of the totality of the circumstances. *Cortez*, 449 U.S. at 417 (holding that "the totality of the circumstances–the whole picture–must be taken into account"). "Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.*; *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc) ("Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts,

reasonably warrant an intrusion."); *United States v. Antuna*, 186 F. Supp. 2d 138, 142 (D. Conn. 2002) ("The totality of the circumstances is judged based on what the officer knew before the suspect was detained.") (citing *Arvizu*, 534 U.S. at 266). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at

6

7 (quoting *Terry*, 392 U.S. at 27); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). Indeed, the totality of the circumstances should reflect the outcome of a process in which "officers [] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273; *Nelson*, 284 F.3d at 474, 478, 485.

This Court considers whether reasonable suspicion exists based on the following factors, among others: (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking in aliens or narcotics in the area; and (8) the number, appearance, and behavior of the passengers. *Jacquinot*, 258 F.3d at 427 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)).

The *Brignoni-Ponce* factors must not be analyzed in isolation from each other, but rather as a collective whole. *Arvizu*, 534 U.S. at 274 ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances' as our cases have understood that phrase . . . [because] *Terry* . . . precludes this sort of divide-and-conquer analysis."); *United States v. Espinosa-Alvarado*, 302 F.3d 304, 307 n.6 (5th Cir. 2002) ("*Arvizu* simply clarified the principle that reviewing courts 'must look at the totality of the circumstances of each case' when making reasonable-suspicion determinations, making clear that a 'divide-and-conquer' style analysis is inappropriate.") (internal citations omitted);*United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000) ("Our analysis is not limited to any one factor; rather, reasonable suspicion is a fact-intensive test in which we look at all circumstances together to

'weigh not [the] individual layers but the laminated total'.") (internal citation omitted); *United States v. Myers*, 308 F.3d 251, 276 (3rd Cir. 2002) ("In evaluating the totality of the circumstances in a given case, a court may not consider each fact in isolation."); *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002) (same); *United States v. Morgan*, 34 Fed. Appx. 141, 141 (4th Cir. 2002) (unpublished) (same);*United States v. McAllister*, 31 Fed. Appx. 859, 863 (6th Cir. 2002) (unpublished) ("Reasonable suspicion is based on the totality of the circumstances, which requires a reviewing court to examine relevant factors as a collective whole rather than independent pieces."); *United States v. Staples*, 194 F. Supp. 2d 582, 585 (W.D. Tex. 2002) ("[T]he recent opinion in *Arvizu* emphasized that a court may not evaluate the factors in isolation of each other. Rather, the 'totality of the circumstances' approach requires the court to consider the officer's observations and inferences as a comprehensive picture of the situation that, as a whole, may or may not justify reasonable suspicion.").

"No single fact is determinative" of the outcome of a reasonable suspicion analysis. *United States v. Guerrero-Barajas*, 240 F.3d 428, 433 (5th Cir. 2001); *Arvizu*, 534 U.S. at 266 (holding that it is improper to "categorize[] certain factors . . . as simply out of bounds in deciding whether there was 'reasonable suspicion' for the stop"); *Staples*, 194 F.Supp. 2d at 585 ("[A] court may not conclude, merely because no single observation alone justifies reasonable suspicion, that the totality of the circumstances does not justify reasonable suspicion.").

The Supreme Court has repeatedly emphasized that a collection of otherwise lawful or innocent behaviors can amount to reasonable suspicion. *Arvizu*, 534 U.S. at 277 ("A determination

that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.").

In *Terry*,

> [the police officer] . . . observed [the defendants] go through a series of acts, *each of them perhaps innocent in itself*, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

392 U.S. 1, 22-23 (1968).

Similarly, the Supreme Court concluded in *Sokolow* that purchasing airplane tickets in cash, carrying large amounts of cash, traveling under an alias, and flying for 20 hours to spend 48 hours in Miami during the month of July were sufficient to amount to reasonable suspicion. 490 U.S. at 8-9. "Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." *Id.* at 9. Analogizing to the probable cause inquiry, the Supreme Court held that "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* at 10; *United States v. Harvey*, 55 Fed. Appx. 662, 663 (4th Cir. 2003) (unpublished) ("The police officer does not have to rule out the possibility that the target of his investigation was engaged in innocent conduct.").

In this case, Neufeld was alone and driving north on U.S. Highway 385 through a national park with a tourist permit attached to his windshield. The Agents encountered his red-and-white pickup around noon on a Friday in May. Such conduct, by itself, is not necessarily suspicious. However, we must view all the facts as a collective whole in light of the context and the Agents' experience.

Although "heavily traveled by tourists," U.S. Highway 385 "is also known to be a route preferred by drug smugglers." *United States v. Rodriguez-Rivas*, 151 F.3d 377, 378 (5th Cir. 1998) (suggesting that the immigration checkpoint at U.S. Highway 385 is not always manned); *Jacquinot*, 258 F.3d at 428; *United States v. Saenz*, 578 F.2d 643, 645 (5th Cir. 1978); Judge Ferguson Testimony, *supra* note 3. Indeed, Big Bend is in an area "frequently . . . used for illegal trafficking of aliens and drugs." *United States v. Morales*, 191 F.3d 602, 604 (5th Cir. 1999); *United States v. Acosta*, 763 F.2d 671, 688 (1985) (discussing the defendant's four trips to "the Big Bend Park area to obtain marijuana").

The Agents encountered Neufeld's pickup thirty-five miles from the U.S.-Mexico border on a highway that crosses the U.S.-Mexico border. Proximity to the border and use of a major highway are not necessarily suspicious, but in other cases, these factors have supported reasonable suspicion.

> This Court considers the fact that a vehicle may have recently crossed the border as a vital element in making an investigatory stop. *United States v. Melendez-Gonzalez*, 727 F.2d at 407-411 (5th Cir. 1984). This stems from the fact that we are reluctant to allow governmental interference with people traveling within our country, even if the vehicle is traveling close to the border. *Id.* That situation, however, is completely different from the instance where someone has "definitely and positively entered this country from abroad." *Id.* (quoting *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir. 1977)). In the latter case, a stop at the border or its "functional equivalent" is automatically justified without a showing of probable cause or even reasonable suspicion. *Id.* (citing *Almeida-Sanchez v. United States*, 413 U.S. 266,

272-73, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973)). At times, this issue is resolved by an analysis of the road the vehicle was traveling on, the number of towns along the road, the number of intersecting roads and, finally, the number of miles the vehicle was actually from the border at the point of the stop. *United States v. Cardona*, 955 F.2d 976, 980 (5th Cir. 1992) . . . . Vehicles traveling more than fifty miles from the border are usually a "substantial" distance from the border. [*Id.* at] 980 (stop was proper where vehicle was between 40 and 50 miles from Mexican border); *Melendez-Gonzalez*, 727 F.2d at 407-411 (a stop sixty miles from the Mexican border was not sufficient to establish that vehicle originated from the border).

*United States v. Inocencio*, 40 F.3d 716, 722 n.6-7 (5th Cir. 1994). In this case, it is noteworthy that: (1) Neufeld was thirty-five miles from the border; (2) he was traveling north; (3) the highway does not appear to traverse any settled area other than Panther Junction, the National Park Service headquarters; and (4) U.S. Highway 385 only intersects one other road between the border and the location where the Agents encountered Neufeld. *Id.*

In a motion for reconsideration, Neufeld challenged the Agents' experience, alleging certain inconsistencies in their testimony. Though it denied the motion for reconsideration, the district court stated: "[i]t appears that the Agents' time along the border has not enhanced their ability to identify vacationers in Big Bend." The district court refused to "infer that [the Agents'] years of service have taught them nothing;" therefore, the district court considered the Agents' experience-based observations and inferences regarding Neufeld's proximity to the border and the drug cache, his use of a known smuggling route, and his behavior upon sight of Marshall's marked patrol car. In a similar case, the Sixth Circuit held:

> While Appellant challenges Sharp and Booker's experience as police officers, this is but one factor in the totality analysis, and is not determinative. *See Arvizu*, 122 S. Ct. at 751. The entire series of events must be viewed through the lens of the officers' experience, but their purported inexperience does not, by itself, make their suspicions unreasonable. Here, the

other relevant factors, even with the officers' relative inexperience, provide the reasonable suspicion necessary for a constitutional stop.

*United States v. McAllister*, 31 Fed. Appx. 859, 865 n.3 (6th Cir. 2002) (unpublished). Marshall only had one and one-half years of experience when he encountered Neufeld. Like the Sixth Circuit, we find that Marshall's purported inexperience does not, by itself, make his suspicions unreasonable. *Id.* Marshall benefitted from Garcia's thirteen years of experience in deciding to stop the pickup. Even if we assume (as the district court suggested) that the Agents could not properly identify a vacationer in Big Bend, the other relevant factors provide the reasonable suspicion necessary for a stop. *Id.*

Viewing the evidence as a collective whole through the lens of the officers, we find the following factors provided the reasonable suspicion necessary to stop Neufeld's pickup: (1) Neufeld's proximity to the border (35 miles); (2) his proximity to the drug cache (2 miles); (3) his use of a known drug smuggling route (U.S. Highway 385) in an area known for drug smuggling (Big Bend); and (4) his behavior upon sign of the marked patrol car (Neufeld appeared stiff, stared straight ahead, failed to acknowledge Marshall, and slowed down considerably). "Undoubtedly, each of these factors alone is susceptible to innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for . . . stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." *Arvizu*, 534 U.S. at 277-78; *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) ("All relevant factors must be considered in the reasonable suspicion calculus–even those factors that, in a different context, might be entirely innocuous."). Therefore, the district court correctly denied Neufeld's motion to suppress.

## IV. CONCLUSION

Accordingly, the judgment of the district court is AFFIRMED.