**UNITED STATES of America**

v.

**Rigoberto LAIJA–GARCIA**

**No. EP–03–CR–1462–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

Feb. 27, 2004.

Antonio Franco, Jr., Assistant U.S. Attorney, El Paso, TX, for Plaintiff.

Ahilan Thevanesan Arulanantham, Federal Public Defender, El Paso, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE*

MARTINEZ, District Judge.

On this day, the Court considered Defendant Rigoberto Laija–Garcia's "Motion to Suppress" and "Brief in Support of Motion to Suppress," filed on August 20, 2003 in the above-captioned cause. The Government filed its Response on August 29, 2003. The Court held hearings on the Motion on September 26, 2003 and October 9, 2003. At the end of the hearing ·on October 9, 2003, the Court ordered Defendant Rigoberto Laija–Garcia ("Defendant") to file a supplemental brief specifically addressing his argument that the Border Patrol Agents did not have the

statutory authority to stop him.[1] Defendant filed a supplemental brief on October 16, 2003, and the Government responded on October 23, 2003. After careful consideration of the evidence and briefs, the Court is of the opinion that Defendant's Motion to Suppress should be denied for the following reasons.

## I. FINDINGS OF FACT

1. On at least two occasions, in the weeks preceding July 24, 2003, several unidentified individuals illegally entered into the United States from Mexico through a sparsely populated ranching area known as Esparza, Texas, which is located between Sierra Blanca and Fort Hancock. These unidentified individuals traveled through this area on horseback and were carrying some form of a controlled substance. In response, U.S. Border Patrol ("Border Patrol") installed a sensor approximately 17.8 miles east of Fort Hancock in order to assist in the detection of illegal crossings.

2. At approximately 12:20 a.m. on July 24, 2003, the newly installed sensor was activated. Border Patrol agents quickly responded to the sensor activation.

3. Border Patrol Agent Eduardo de la Cruz ("Agent Cruz") was one of the five agents to respond to the July 24 sensor activation. Based on his seven years experience of working on drug smuggling cases as a Border Patrol agent, he knew that the sensor was located in an area that was frequently traversed by drug smugglers. Accord-

ingly, Agent Cruz decided to look for vehicles that may be stationed in the area waiting to pick up potential drug smugglers.

4. Border Patrol Agent Omar Ortiz ("Agent Ortiz") was approximately thirty miles away from the sensor when he was notified of its activation. Rather than travel directly to the sensor, Agent Ortiz, a Border Patrol agent with six years experience, decided to travel on a road located just north of the sensor in order perform "sign cutting."[2] While traveling along the road just north of the sensor, Agent Ortiz observed fresh hoofprints. Given his extensive experience with tracking drug smugglers in this area, he knew that drug smugglers typically used horses to smuggle drugs through this specific area because of its rough terrain. Agent Ortiz thereupon notified the other Border Patrol agents who were investigating the sensor area indicating that he had discovered fresh hoofprints.

5. In response to Agent Ortiz's discovery of hoofprints, Agent Cruz traveled to the sensor and inspected the surrounding area. Agent Cruz soon discovered fresh hoofprints. The fresh hoofprints appeared to have been created by at least one horse that was traveling toward the area that Agent Ortiz was investigating. Shortly after finding the hoofprints near the sensor, Agent Ortiz notified Agent Cruz that he discovered four burlap sacks containing marijuana near the frontage road south of Interstate 10.

---

1. Defendant did not raise this argument until the October 9, 2003 hearing. In order to provide the Government a fair opportunity to respond to Defendant's newly raised argument, the Court ordered the parties to file additional briefs on the issue.

2. "Sign cutting" is a process in which Border Patrol agents search for tracks, such as human or animal footprints, indicative of illegal entry into the United States. *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed.Cir. 1996).

6. Upon hearing about the discovery of the marijuana, Agent Cruz traveled toward the frontage road and parked his vehicle on the side of the road. Since the burlap sacks were located a short distance from the frontage road, Agent Cruz and Border Patrol Agent Arnold ("Agent Arnold") dragged the burlap sacks to the Agent Cruz's vehicle. As they transported the burlap sacks to the frontage road, Agent Cruz observed a Ford Escort traveling abnormally slow towards Agent Cruz's vehicle.

7. Agent Cruz then illuminated his flashlight at Defendant, the driver and single passenger of the Ford Escort. Upon realizing that Agent Cruz was on the frontage road, Defendant's eyes opened widely and he immediately began to accelerate his speed.

8. Given the fact that it was approximately 1:00 a.m., the fact that the Defendant was driving down a clearly marked dead-end road that was typically only used by ranchers during the day, the fact that Defendant reacted strangely when the vehicle was illuminated, and the fact that Border Patrol agents had lost two prior loads in the same area within the recent past few weeks, Agent Cruz was suspicious of the vehicle. Agents Cruz and Arnold decided to get into Agent Cruz's vehicle, turned on their emergency flashers, and then stopped Defendant's vehicle.[3] Upon approaching the vehicle, Agent Cruz identified himself as a Border Patrol agent and asked Defendant about his immigration status. Defendant then produced his resident alien card verifying his legal status in the United States. Agent Cruz observed Defendant who appeared to be very nervous, his hands visibly shaking and his neck was "bulging out" as he held his resident alien card.

9. Agent Cruz, aware that the direction of Defendant's travel lead to a dead-end, then asked Defendant why he was traveling westbound on the frontage road. Defendant responded that he was moving from El Paso, Texas to Midland, Texas. Aware that Midland, Texas was east of El Paso, Agent Cruz again asked Defendant why he was traveling westbound. Defendant then responded that his Ford Escort started to have problems as he was traveling back to Midland (eastbound) so he had decided to get off on the frontage road and return to El Paso (westbound) so that he could get the vehicle serviced.[4] When Agent Cruz inquired why Defendant was not carrying any personal items (like luggage) which one might be carrying when leaving one location for another, and Defendant responded that he had already moved to Midland and that he had returned to El Paso to recover something he left behind.

10. In order to ensure that Defendant would not attempt to drive away, Agent Cruz asked Defendant to exit the vehicle. After Defendant exited the Ford Escort, Agent Cruz apprised Defendant of his rights in Spanish and explained that he was not under arrest. Agent Cruz then asked Defendant for consent to search the Ford Escort. Defendant then stated that he had just pur-

---

**3.** Agent Ortiz's testimony indicates the Defendant was stopped by Border Patrol Agents approximately 5–8 miles from the Rio Grande, the U.S.-Mexico Border.

**4.** Agent Cruz's testimony indicates that he did not observe any mechanical problems with the vehicle.

chased the vehicle that evening and did not know what was in the vehicle, but he consented to the search. During the search, Agent Arnold discovered a two-way radio underneath the driver's seat and two cellular phones lying on the passenger seat, the presence of which are consistent with drug trafficking.[5]

11. Agent Cruz then confronted Defendant and explained to him that the Defendant's actions, as well as the evidence in the vehicle, seemed to be consistent with individuals involved in a drug trafficking conspiracy based upon his extensive experience.

12. Defendant then voluntarily admitted that he was in fact involved in a drug conspiracy to import a controlled substance. Defendant, however, explained that his role in the conspiracy was limited to driving the Ford Escort to mile marker 92 and then contacting another member of the drug conspiracy who would then pick him up. Defendant also indicated that the other members of the conspiracy intended to use his Ford Escort to transport the controlled substance which had recently been illegally smuggled into the United States to another destination.

## II. CONCLUSIONS OF LAW

### A. Introduction

The Court must initially address whether Agents Cruz and Arnold had reasonable suspicion to conduct an investigatory detention of Defendant. Defendant argues that Agents Cruz and Arnold did not have reasonable suspicion to stop him. The Government responds that reasonable suspicion did exist to stop Defendant given the totality of the circumstances.

The Court must then consider whether the Border Patrol agents had the statutory authority to arrest Defendant. Defendant asserts, as an alternative argument, that even if the Border Patrol agents had reasonable suspicion to stop the vehicle, they lacked the statutory authority to arrest him because the Border Patrol agents suspected him of committing a drug trafficking offense, not violating the immigration laws. In support of his position, Defendant contends that Congress intentionally limited the Border Patrol agents' arrest authority to conduct a search and seizure under the Immigration and Nationality Act, 8 U.S.C. § 1357, to ensure that the Border Patrol agents enforced the immigration laws of the United States. According to Defendant, the Immigration and Nationality Act empowers Border Patrol agents to stop suspected aliens under two limited circumstances, none of which were satisfied in this case. The Government, on the other hand, contends that the Border Patrol agents did act within the scope of its authority as defined by 8 U.S.C. § 1357. In the alternative, the Government asserts that Title 21 of the United States Code authorized the Border Patrol agents to arrest Defendant. Finally, the Government contends that even if the Court were to find that the Border Patrol agents lacked the statutory authority to arrest Defendant, the evidence should not be suppressed because the Border Patrol agents' conduct fell within the good faith exception to the exclusionary rule.

### B. Whether Border Patrol agents had reasonable suspicion to conduct an investigatory detention

#### 1. Fourth Amendment

■ The Fourth Amendment to the United States Constitution guarantees

---

**5.** Agent Cruz's testimony establishes that cell phones and two-way radios are commonly used by drug traffickers based upon his exten-

sive experience in dealing with drug smugglers.

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment bars only unreasonable searches and seizures. *See U.S. v. Brignoni–Ponce,* 422 U.S. 873, 877, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *U.S. v. Pierre,* 958 F.2d 1304, 1308 (5th Cir.1992). The essential purpose of the Fourth Amendment is to impose a standard of reasonableness upon law enforcement agents. The reasonableness inquiry is driven by a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Pierre,* 958 F.2d at 1308–09 (*citing New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986)); *see also Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). However, the intrusiveness of the search is not measured so much by its scope as by whether it invades an expectation of privacy that society is prepared to recognize as "reasonable." *Pierre,* 958 F.2d at 1309 (*citing Katz v. U.S.,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The exclusionary rule, as it has developed under the Fourth Amendment, provides that evidence obtained in violation of an individual's Fourth Amendment rights may not be introduced against him at trial. *See Wong Sun v. U.S.,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). For the most part, courts look askance at any searches conducted without a warrant. The Supreme Court has determined that warrantless searches and seizures are *per se* unreasonable unless they fall within a few narrowly defined exceptions. *U.S. v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir.1993) (*citing Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Furthermore, the protection of the Fourth Amendment extends beyond the home out to the sidewalk and even into a person's automobile. *See Prouse,* 440 U.S. at 663, 99 S.Ct. 1391 (*citing Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)) ("[P]eople are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles."). Moreover, it is well established that a traffic stop is a limited seizure within the meaning of the Fourth Amendment. *Prouse,* 440 U.S. at 653, 99 S.Ct. 1391. In fact, the stopping of an automobile and the detention of its occupants constitutes a "seizure," even when the purpose of the stop is limited and the resulting detention brief. *Id.*

## 2. Investigatory Stop

It is well established that a law enforcement officer may lawfully stop a vehicle only when there is probable cause to stop the vehicle or when he or she has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *See U.S. v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *U.S. v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *U.S. v. Breeland,* 53 F.3d 100, 102 (5th Cir.1995); *U.S. v. Tellez,* 11 F.3d 530, 532 (5th Cir. 1993) (*citing Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868). The latter type of stop is often referred to as an investigative or *Terry* stop. *See Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *U.S. v. Cooper,* 43 F.3d 140, 145 (5th Cir.1995). According to *Terry,* even in the absence of probable cause, police may stop persons

and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity. *U.S. v. Tapia,* 912 F.2d 1367, 1370 (11th Cir. 1990).

### 3. Reasonable Suspicion

The Fifth Circuit has commented that the " 'somewhat abstract' and 'elusive' nature of the reasonable suspicion standard makes it impossible to create 'a neat set of legal rules' of what constitutes reasonable suspicion, but this very elusiveness provides courts with the flexibility necessary to make case-specific determinations based on particularized facts." *U.S. v. Neufeld–Neufeld,* 338 F.3d 374, 378 (5th Cir.2002) (*citing U.S. v. Arvizu,* 534 U.S. 266, 274–75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

When making reasonable-suspicion determinations, a federal court "must look at the 'totality of the circumstances' for each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744. "Reasonable suspicion must be supported by particular and articulable facts, which, [when] taken together with rational inferences from those facts, reasonably warrant an intrusion." *U.S. v. Michelletti,* 13 F.3d 838, 840 (5th Cir.1994) (en banc). Moreover, the "totality of the circumstances is judged based on what the officer knew before the suspect was detained." *U.S. v. Antuna,* 186 F.Supp.2d 138, 142 (D.Conn. 2002) (*citing Arvizu,* 534 U.S. at 273, 122 S.Ct. 744). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.' " *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (*quoting Terry,* 392 U.S. at 27, 88 S.Ct. 1868). Indeed, the totality of the

circumstances should reflect the outcome of a process in which "officers draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744.

■ The Fifth Circuit has expressly instructed district courts to consider the following factors when considering whether a Border Patrol agent or a customs agent has reasonable suspicion to conduct an investigatory detention near the United States border with Mexico:

> (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking in aliens or narcotics in the area; and (8) the number, appearance, and behavior of the passengers.

*Jacquinot,* 258 F.3d at 427 (*citing Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. 2574). The *Brignoni–Ponce* factors should not be analyzed in isolation from each other, but rather examined as a collective whole. *Neufeld–Neufeld,* 338 F.3d at 379–80. Furthermore, no one factor is dispositive and the eight enumerated factors are not an exhaustive list of factors a court may consider when making a reasonable suspicion determination. *Id.*

■ Applying the relevant *Brignoni–Ponce* factors to the present case, the Court makes the following findings: First, the evidence specifically reveals that the traffic stop of the Ford Escort occurred on the frontage road which is situated less than fifty miles from the Mexican border.[6]

---

**6.** As noted earlier, Border Patrol Agents stopped Defendant approximately 5–8 miles from the U.S.-Mexico Border.

Second, the evidence establishes that the area surrounding the frontage road is sparsely populated containing only a few trailer homes and general ranchland. Moreover, the frontage road runs parallel to Interstate 10—a major interstate highway used for the transportation of goods and individuals from the border area to destinations away from the border area. Third, the evidence establishes that the frontage road is typically used only by ranchers during daytime hours for the specific purpose of ranching activity. Fourth, the evidence establishes that Agent Cruz has had extensive experience with the Drug Enforcement Administration and U.S. Border Patrol. Fifth, the evidence establishes that Defendant's behavior was suspicious because he was driving very slowly down a dead-end paved frontage road commonly used only during the day and rarely after midnight. Moreover, when Defendant realized that Agent Cruz was on the frontage road, his eyes opened wide and he immediately accelerated his vehicle and drove past the Border Patrol agents. Sixth, the evidence does not show that any physical aspect or characteristic of the Ford Escort, in and of itself, was suspicious. Seventh, the evidence establishes that Agent Cruz was aware of the fact that drug smugglers on at least two recent occasions had successfully imported drugs through the same area on horseback.

### C. Whether the Border Patrol agents had the authority to arrest Defendant under 8 U.S.C. § 1357

 Specifically, the Government argues that the Border Patrol agents' conduct clearly falls within 8 U.S.C. § 1357(a)(5)(B) because the Border Patrol agents conducted the stop as they were investigating an illegal entry into the United States at the time they observed Defendant's vehicle on the frontage road south

of Interstate 10. The purpose of 8 U.S.C. § 1357 is to allow Border Patrol agents to conduct warrantless arrests of individuals who they suspect have violated an immigration law of the United States. Pursuant to 8 U.S.C. § 1357, however, Border Patrol agents also have the authority to make arrests for non-immigration felonies if the agents are performing duties relating to the enforcement of immigration laws at the time of the arrest. *U.S. v. Perkins,* 166 F.Supp.2d 1116, 1122 (W.D.Tex.2001). This authority is limited to two limited circumstances:

(A) for any offense against the United States, if the offense is committed in the officer's or employee's presence, or (B) for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony, if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

8 U.S.C. § 1357(a)(5).

Although few appellate courts have considered 8 U.S.C. § 1357(a)(5)(B), at least one district court has addressed whether 8 U.S.C. § 1357(a)(5)(B) provides a border patrol agent with the authority to arrest a defendant for a non-immigration related offense. In *Perkins,* a U.S. Customs officer received a tip from a reliable confidential informant that a recreational vehicle (" R.V.") would be loaded with a controlled substance in Redford, Texas, a border town situated on the Rio Grande, and would then depart at approximately 7:30 a.m. The U.S. Customs officer shared the information with Border Patrol and asked that its agents be on the lookout for a R.V. departing from Redford, Texas at that

hour. At approximately 7:40 a.m., two Border Patrol agents who were conducting surveillance spotted an R.V. traveling from Redford. The Border Patrol agents stopped the R.V. and inquired about the defendant's citizenship. The defendant produced identification showing that he was a U.S. citizen. The Border Patrol agents then requested the defendant's consent to search the R.V. During the search of the R.V., the Border Patrol agents discovered marijuana inside the R.V. Defendant was then arrested for his involvement in the drug smuggling conspiracy.

Defendant filed a motion to suppress asserting that the Border Patrol agents exceeded their arrest authority under 8 U.S.C. § 1357(a)(5) when they arrested him for a non-immigration offense.[7] Defendant requested that the court suppress the evidence that was obtained from Defendant. In its carefully drafted opinion, the court concluded that the Border Patrol agents exceeded their authority under 8 U.S.C. § 1357(a)(5)(B) because they were not performing duties related to the enforcement of immigration laws at the time they initiated their stop. However, even though the Border Patrol agents exceeded the scope of 8 U.S.C. § 1357(a)(5), the court determined that evidence should not be suppressed because the Border Patrol agents' conduct fell within the good faith exception to the exclusionary rule.[8]

On appeal, the Fifth Circuit affirmed the district court's decision finding that the Border Patrol agents had reasonable suspicion as well as the statutory authority to stop the vehicle. *United States v. Perkins,* 352 F.3d 198, 200 (5th Cir.2003). Specifically, the Fifth Circuit concluded "that Border Patrol agents may make roving stops on the basis of reasonable suspicion of any criminal activity, and are not limited to suspicion of violation of immigration laws." *Perkins,* 352 F.3d at 200.[9]

The Court, however, finds that *Perkins* is factually distinguishable from the case at hand and therefore need not control the Court's analysis. Specifically, the Court finds that the arrest in *Perkins,* unlike the stop in the present case, was not conducted during the course of an investigation of a possible immigration violation. In *Perkins,* the Border Patrol agents were conducting surveillance of the road specifically looking for a vehicle suspected only of carrying a controlled substance. At the time, the Border Patrol agents did not have any reason to suspect that the driver of the R.V. had violated any immigration laws.

In the present case, however, the Border Patrol agents were tipped off by a sensor which they installed along the border to detect possible illegal entries and drug smuggling activities. Thus, Defendant was arrested during the course of an investigation of a possible illegal entry or drug crossing into the United States which may have activated the sensor located 17.8

---

7. The defendant also asserted that the Border Patrol agents lacked reasonable suspicion and the statutory authority to stop the vehicle.

8. In its opinion partially granting the Government's Motion for Reconsideration, the district court concluded that the Border Patrol agents, being cross designated by the Attorney General, also had the authority to stop and search the R.V. pursuant to their Title 21 enforcement authority. *U.S. v. Perkins,* 166 F.Supp.2d 1116, 1123 (W.D.Tex.2001).

9. While the Fifth Circuit did not expressly discuss 8 U.S.C. § 1357 or Title 21 in *Perkins,* it did affirm the conviction of the defendant allowing this Court to conclude that Border Patrol agents are authorized to stop and thereby arrest a defendant for a non-immigration related offense committed at or near the border.

miles east of Fort Hancock. The fact that the drugs were eventually found during the investigation of the sensor activation does not negate the agent's original purpose in responding which was to investigate a possible immigration violation or drug smuggling activity. To adopt Defendant's reasoning in this case would require the Court to turn a blind eye to the testimony indicating that illegal entries and drug smuggling efforts in this particular location are oftentimes related given its proximity to the border.[10] If a Border Patrol agent is investigating a sensor hit near the U.S.-Mexico Border, his or her experience would allow him/her to question whether a sensor could have been triggered by either persons who entered the United States illegally for the purpose of remaining in the United States, or by drug smugglers who entered the United States illegally from Mexico for the purpose of distributing and selling narcotics. However, the mere fact that in the end a Border Patrol agent discovers that the sensor was triggered by drug smugglers does not erase the fact that the sensor triggered the Border Patrol of the possibility of either one of these violations. This is in direct contrast to *Perkins* where the Border Patrol agents were tipped off only about a vehicle transporting drugs. Hence, the Court rejects Defendant's argument that the purpose of the stop was not related to an immigration offense and finds that the stop of the vehicle was in fact related to the Border Patrol agent's investigation of a possible immigration violation.

In the present case, the evidence establishes that the Border Patrol agents satisfied all three conditions of 8 U.S.C.

§ 1357(a)(5)(B) and therefore acted within their arrest authority. First, given the Defendant's conduct and admission to his involvement in the drug conspiracy, the Border Patrol agents did have reasonable grounds to believe that Defendant was involved in the commission of a felony against the United States. Second, given that the Border Patrol agents were investigating what triggered the sensor activation—an activity related to the enforcement of the immigration laws of the United States—at the time they stopped and arrested, the Border Patrol agents satisfied the second condition of 8 U.S.C. § 1357(a)(5)(B). Third, given that it was approximately 1:00 a.m. and the location of Defendant's vehicle, it is highly likely that Defendant would have been able to escape if the Border Patrol agents did not arrest him at that point.

### D. Whether the Border Patrol agents conduct is covered under Title 21 of the United States Code or the good faith exception to the exclusionary rule

Given the Court's finding that the Border Patrol agents' arrest falls within the scope of Title 8 U.S.C. § 1357(a)(5)(B), the Court need not address whether Title 21 of the United States Code provided the Border Patrol agents the authority to arrest Defendant or whether the Defendant's conduct falls with the good faith exception to the exclusionary rule.

### III. CONCLUSION

After carefully analyzing the facts of the present case under the eight *Brignoni-Ponce* factors, the Court finds that the Border Patrol agents had reasonable sus-

**10.** This is especially true given that on at least two occasions, in the weeks preceding July 24, several unidentified individuals illegally entered into the United States from Mexico through this same location. These individuals entered on horseback and were carrying large quantities of a controlled substance.

picion to stop Defendant as he slowly traveled down the dead-end frontage road at that late hour in the evening. Accordingly, the Court finds that the Border Patrol agents did have reasonable suspicion to stop the Ford Escort and therefore they did not violate Defendant's Fourth Amendment rights.

Accordingly, **IT IS ORDERED** that Defendant's Motion to Suppress is **DENIED**.