**UNITED STATES of America,**

v.

**Fernando ANTUNA, Defendant.**

**No. CR. 3:01–CR–133(JCH).**

United States District Court,
D. Connecticut.

Feb. 14, 2002.

Francis L. O'Reilly, O'Reilly & Shaw, Fairfield, CT, for defendant.

John A. Danaher, III, U.S. Attorney's Office, New Haven, CT, James Joseph Finnerty, III, Kari Anne Dooley, U.S. Attorney's Office, Bridgeport, CT, for U.S.

## RULING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [DKT. NO. 33]

HALL, District Judge.

On the evening of May 18, 2001, defendant Fernando Antuna was standing on a street corner in Bridgeport talking with three friends when he was detained and searched by two police officers. The officers recovered a .380 model handgun from Antuna's waistband. Antuna, who has previously been convicted of a felony, was thereafter indicted in this case for unlawful possession of a weapon by a felon.

Antuna has moved to suppress the gun. An evidentiary hearing was held on January 28, 2002, regarding the suppression motion. For the reasons stated below, the motion is granted.

## I. BACKGROUND

According to the defendant's witnesses, during the evening of May 18, 2001, the defendant, Fernando Antuna, was standing on the corner of Berkshire Avenue and Kossuth Street in Bridgeport, talking with three friends, Marta Aguilar, Pedro Hostos and Carmen Huertas. Aguilar had just brought Antuna some dinner which he ate while out on the sidewalk. Hostos had joined the group to pass some time while he waited for his cousin to get ready to go to dinner. Aguilar was leaning against a car which was parked on the street, and the other three stood facing her and the street. All four noticed a police car as it drove slowly down the street, although they continued their conversation as the police drove past.

According to the police officers, Officer Edward Rivera of the Bridgeport Police Department was driving his patrol car down Berkshire Avenue in Bridgeport. With him in his car was trainee Officer Thomas Lattanzio. As they were driving, according to his testimony, Officer Rivera noticed a group of people standing on the sidewalk, near the street corner, and two people crossing the street. As he drove past, members of the group standing on the sidewalk looked down. At one point in his testimony, Officer Rivera also stated that in addition to looking down, the people turned their backs and acted nervous. In subsequent testimony, however, he mentioned only the looking down or away. The court credits this latter testimony and finds that the officer, in his first quick look at the group, perceived some people turning away from him. Having caught a quick glimpse of Antuna's face before he looked down, Officer Rivera drove slowly to the next corner, observing through the rear view mirror the group intently watching him, and then did a U-turn and drove back. Officer Rivera told Officer Lattanzio that he believed that there was a warrant outstanding for the arrest of one of the men on the corner. Officer Rivera then stopped the car, pulling in on an angle a few feet from where the group stood, and exited his vehicle along with Officer Lattanzio. He addressed the group, asking everyone for identification, which he then handed to Officer Lattanzio. Officer Rivera also said that one of the men looked familiar. He then asked Hostos to get up against the fence and to empty his pockets. Officer Rivera then conducted a pat down search of Hostos.

Having found no contraband on Hostos, he turned to search Antuna.

There is considerable dispute among the parties regarding the behavior of Antuna during the time Hostos was being searched. Officer Rivera testified that Antuna was moving away, by rocking back and forth in small semi-circles, and refused to comply with an initial request to get up against the fence. Officer Rivera also testified that Antuna and Carmen were making eye contact during this time period and that Carmen was talking non-stop. Aguilar testified that Carmen was speaking with her daughter who had come over to them and that Carmen was trying to get her daughter to go back into their house across the street. Aguilar and Hostos also testified that Antuna was not rocking back and forth and that Antuna got up against the fence at the first instruction to do so by the officer.[1]

Antuna was eventually put up against the fence and searched. When patting down his waist area, Officer Rivera felt the handle of a metal object and proceeded to remove a .380 handgun from Antuna's waist. Hostos and Aguilar testified that Rivera also removed prescription drugs from Antuna's pockets as well as a bag of marijuana after patting him down three times. However, the officers dispute that more than one search was conducted and that these additional items were found during the search. These items do not appear on the police prisoner inventory sheet filled out for Antuna following his arrest. Antuna was arrested following the

search and charged with criminal possession of a firearm, carrying a pistol without a permit. An NCIC check was run on the identifications of Antuna, Hostos and Huertas following the searches.

## II. LEGAL STANDARDS

### A. Reasonable Suspicion

██ The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. 4. Police have constitutional authority consistent with the Fourth Amendment to briefly detain a suspect when an officer has a reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While reasonable suspicion is a less demanding standard than probable cause, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). "Reasonable suspicion, like probable cause, is dependent upon both the content of the information possessed by the police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). "These two factors—the quantity of information and its quality or reliability—are inverse variables in the reasonable suspicion calculus: if the information is highly reliable, there need not be much of it, but if it 'has a relatively low

---

**1.** During the testimony of both Hostos and Aguilar, an issue was raised by the government regarding the fact that these witnesses had given oral statements to an investigator which had been tape recorded. While signed written statements, prepared from the recordings, were disclosed, the defense had not disclosed copies of the tape recordings. The defense represented to the court that the tape recordings had been destroyed by the investi-

gator after transcribing them verbatim, without counsel's knowledge, and that is why they had not been disclosed. The government indicated that it would need to time to research the matter further to decide whether it would press the issue. However, the government has not raise the issue in any subsequent filings, in particular it did not raise the issue in its supplemental memorandum regarding the motion to suppress.

degree of reliability, more information will be required to establish the requisite quantum of suspicion.'" *United States v. Hoskie,* 2000 WL 1052022, *4 (D.Conn. 2000) (citing *Alabama v. White, supra* ).

■ In assessing the reasonableness of a *Terry* stop, the court must consider the totality of the circumstances of each case "to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts...." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

■ Conducting a *Terry* stop to investigate an already completed crime does not promote the same interest in crime prevention as a stop conducted to halt criminal activity as it is occurring. *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). However, the ability to stop a person suspected of being involved previously in a crime "promotes the strong government interest in solving crimes and bringing offenders to justice." *Id.* Therefore, "if the police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* If an officer has reasonable suspicion necessary to stop an individual, the investigating agent may also frisk for weapons if the officer reasonably believes that person to be armed and dangerous. *United States v. Colon,* 250 F.3d 130, 134 (2d Cir.2001).

## B. Burden of Proof

■ A defendant who seeks to suppress evidence recovered in a *Terry* stop and frisk must demonstrate that he had a reasonable expectation of privacy in the place searched. *United States v. Ferguson,* 130 F.Supp.2d 560, 565 (S.D.N.Y. 2001); *see also, Terry,* 392 U.S. at 9, 88 S.Ct. 1868. A person has a reasonable expectation of privacy of his person as he stands on the street corner or walks down a street. *Terry,* 392 U.S. at 9, 88 S.Ct. 1868. If the defendant meets this initial burden, as Antuna has in this case, the burden shifts to the government to prove that there was reasonable suspicion for the search. *United States v. Perea,* 986 F.2d 633, 644–45 (2d Cir.1993).

## III. DISCUSSION

■ The totality of the circumstances is judged based on what the officer knew before the suspect was detained. *Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *Hoskie,* 2000 WL 1052022 at *4. Therefore, for the purposes of deciding this motion, the court finds that the *Terry* stop occurred when Officer Rivera exited the car and approached the group.

■ During the hearing on this motion and in its post-hearing memorandum, the government laid out the totality of the circumstances that caused the officers to become suspicious of Antuna. Specifically, Officer Rivera thought that there might be an outstanding warrant for Antuna's arrest. This, combined with the fact that Antuna looked down and away as the police car drove past, and then "keenly followed" the police car as it drove past, aroused the officer's suspicion. Although disputed, there was also evidence presented that the corner on which Antuna was stopped was located in a neighborhood that generally could be considered a high crime area. The government argues that

the totality of these circumstances justified the stop to investigate the situation further.

Even accepting these as the circumstances that existed leading up to the stop, the court finds that the evidence in this case indicates that the officer had little more than a hunch about Antuna and that the totality of the circumstances was not such as to give rise to a reasonable suspicion of wrongdoing. *See United States v. Bayless,* 201 F.3d 116, 133 (2d Cir.2000) ("reasonable suspicion is an objective standard ... a district court must not merely defer to the police officer's judgment."). The government has failed to establish, by a preponderance of the evidence, "a minimal level of objective justification" for the stop. *Illinois v. Wardlow,* 528 U.S. at 123, 120 S.Ct. 673.

The court is cognizant that all of the circumstances leading to a stop must be assessed as a totality. However, the court must first, as an analytical matter, discuss the nature and reliability of each of the circumstances individually in order to then assess the circumstances as a totality and determine whether the circumstances in total sufficed to justify the stop.

Officer Rivera testified that his suspicion was aroused when he caught a quick glimpse of Antuna, presumably just before Antuna looked away, and based on that glimpse, came to the conclusion that Antuna was a person for whom there was a warrant out for his arrest. However, in response to questioning from the court, Officer Rivera could not specify what it was about Antuna that triggered the memory of a wanted poster. Officer Rivera was only able to articulate that it was Antuna's facial features generally that aroused his suspicion. Officer Rivera testified that, if he could have pointed to something specific about Antuna that connected him to a wanted poster, he would have included that in his report. There was nothing in his police report regarding what it was about Antuna that connected him with a wanted poster. In addition, Rivera never indicated in his report or during his testimony whether he believed that Antuna was wanted on a felony charge or some minor offense. *Hensley,* 469 U.S. at 229, 105 S.Ct. 675 (the police interest in detaining individuals to investigate their possible involvement in past crimes is much greater in the context of felonies or other crimes involving a threat to public safety).

Officer Rivera was also unable to identify which wanted poster he had been thinking of when he stopped Antuna. There were no posters in his patrol car that day which resembled Antuna, and Officer Rivera could not testify with any particularity about the wanted posters that had been discussed at the station house during roll call prior to his going out on shift that day or even if it was a wanted poster discussed at roll call. Indeed, Officer Rivera was unable even to narrow it down to which board he might have seen the poster on. Officer Rivera testified that, at the station house, there were at least 60 posters up on the East Side board, 60 on the West Side board, 60 on the Central board, and another 40 or 50 on the bookings board; however, he could not recollect where he saw the wanted poster which he thought looked like Antuna. He also testified that there was a considerable number of posters for Hispanic men and that it could have been any one of those posters that aroused his suspicion. In fact, in response to a question about whether any of the posters on the boards looked like Antuna, Officer Rivera responded "absolutely, any one of them could have looked like myself or you, too."

While the court could contemplate a situation where an officer could not produce the particular wanted poster on which he relied, but could testify with some speci-

ficity regarding what it was about the defendant that caught his attention, e.g., a specific feature or mark on his face or physical description that related to a wanted poster, or could identify where he saw the wanted poster and that formed the basis for his reasonable suspicion, that is not the case here. Indeed, Officer Rivera's testimony demonstrated that he was merely speculating about whether Antuna was wanted. In response to a question about whether he had been guessing that he recognized Antuna from the wanted boards, he answered "okay" and then went on to say that "he took a shot at it, thinking that this person was wanted." Rivera clearly had only an "inchoate suspicion or mere hunch" that there was a warrant out for Antuna's arrest. See Terry, 392 U.S. at 27, 88 S.Ct. 1868.

However, it is not Officer Rivera's belief that Antuna was wanted alone that the court must consider: it is all the circumstances that form the basis of the stop, taken together, that must be considered. The other circumstances include Officer Rivera's testimony that Antuna looked down as the police car passed and then watched intently as the police car drove down the street. The court finds that these actions, while subject to an inference of suspicious behavior, are not particularly or highly suspicious. Watching a police car that is proceeding slowly down your street is not particularly unusual behavior nor is turning your head for a moment. See United States v. Parker, 1999 WL 997282, *6 (E.D.N.Y.1999). Certainly, innocuous factors can take on added significance in light of other, more weighty factors which arouse suspicion. United States v. Bayless, 201 F.3d at 134. However, there are no such weighty factors here. Officer Rivera had a vague hunch that Antuna was wanted. Such evidence has a relatively low degree of reliability given Officer Rivera's admission that he could not identify the poster or which of Antuna's features aroused his suspicion and that he was merely "taking a shot."

A further circumstance involved in this stop relates to some testimony at trial indicating that the neighborhood in which Antuna was stopped might be considered a "high crime" neighborhood in general. Whether a stop occurs in such a neighborhood is a relevant consideration in a Terry analysis. Illinois v. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. However, Marta Aguilar testified that, while there had been some arrests a few blocks over, there had been no recent arrests on that block. Indeed, Officer Rivera did not testify that the drug activity was consistently present on that corner, but rather, said that the neighborhood "had its days."

In total, the police officers were relying on relatively little information, and none of that information was highly reliable. See id. In assessing the totality of the circumstances in this case, the court does not find that the nature of the neighborhood generally, combined with the vague hunch that Antuna was wanted and Antuna's actions of looking away and then staring at the slowly moving police car, are enough, when taken as a totality, to justify the search.

In addition, the absence of other circumstances that evening serve to further undermine the officer's claim of reasonable suspicion. Neither officer saw any overtly illegal activity taking place, they saw nothing in the hands of Antuna or anyone he was standing with that would have aroused suspicion, nor did Antuna attempt to walk or run away from the corner as the police passed. See Parker, 1999 WL 997282 at *7. Indeed, Officer Lattanzio did not appear to have even noticed the group standing on the corner until Officer Rivera indicated that he thought he saw someone who was wanted.

The totality of the circumstances that evening were that Officer Rivera believed

Antuna was wanted, the people the officer saw looked away as the police drove by and then intently followed the police car as it drove slowly down the street, and the corner was possibly in a high crime area, without itself being known as such an area. In addition, the court notes the absence of circumstances, including that Antuna did not appear to have anything in his hands and did not attempt to flee from the police. Further, it was a summer evening, still light out, and there appeared to have been other people out on the street, including children. The circumstances that the police relied on to justify the stop are few and not highly reliable, as discussed above. Looking to the totality of the circumstances that evening, the court finds that the officers did not have reasonable suspicion such that it would have justified conducting the *Terry* stop of Antuna and his friends.

The court would also note that it is troubled by the inconsistencies in the account given by the officers of the stop. First, in his report, Officer Rivera indicates that, prior to stopping the car, he observed the group turning their backs and "walking away." An individual's attempt to flee can be relevant to the *Terry* analysis, *Illinois v. Wardlow*, 528 U.S. at 124, 120 S.Ct. 673; however, both officers testified that, in fact, Antuna and his three companions did not walk away and that, when they were stopped, they had not moved from where they were first seen to be standing. The court will not speculate whether the language in the report was an attempt, by the officers, to include facts that would further support the stop, but the court notes the discrepancy between the report and the testimony as a basis to question Officer Rivera's testimony.

A second inconsistency exists between the recollection of the officers of the number of people they stopped and the actual size of the group standing on the corner that evening. Officer Rivera remembered only two males and one female. Officer Lattanzio remembered three or four males and one female. The court finds, based on the testimony of Hostos and Aguilar, that there were two males and two females. In addition, Officer Lattanzio testified that the second male, who was not Antuna, was shorter and stockier than Antuna. In fact, as seen when he appeared in court, Hostos is approximately six feet five inches tall and weighs 290 pounds, while Antuna is around five feet eight inches tall and weighs around 150 pounds.[2] The officers' lack of recollection regarding the circumstances of the group and the individuals involved serves to undermine the reliability of their recollection regarding the circumstances that evening.

Finally, the most important discrepancy in the officers' story regards who it was that Officer Rivera believed had the outstanding warrant when he stopped this group. Both Hostos and Aguilar testified that, upon approaching the group, Officer Rivera addressed Hostos, not Antuna, and told Hostos that he looked familiar. Again, the court finds the testimony of these witnesses credible. Officer Lattanzio testified that Officer Rivera never indicated to him which of the men Officer Rivera recognized and that, as they exited the car, Officer Lattanzio still did not know which of the men was the one in question. Officer Rivera testified to telling one of the men that he looked like someone who was wanted. When asked on cross-examination whether he was addressing Hostos with that remark, he responded that "he

---

2. Officer Rivera testified only that Hostos, the other male, was "larger" than Antuna, which is accurate given their builds, but did not describe him as "taller," which is surprising to the court given the large disparity in height.

**146**

believes" he said it to Antuna. Given the difference in appearance between Antuna and Hostos, Officer Rivera had to be focusing on only one of them. The lack of certainty regarding to whom he addressed his comment further undermines the reliability of Officer Rivera's belief that Antuna was wanted and underscores the fact that Rivera was acting on a guess. Clearly, Officer Rivera could have justified the stop if he believed that Hostos was the one that was wanted and the search of Antuna may have then been justified by his behavior before and after the stop, but the discrepancy in the testimony regarding to whom Officer Rivera was speaking, in light of Officer Rivera's testimony that he "believes" it was Antuna, calls into question whether Officer Rivera actually had some one in mind who was wanted or used the possibility of an outstanding warrant merely as a justification for the stop and search of two males.

## IV. CONCLUSION

The court finds that, in looking to the totality of the circumstances, that the officers did not have reasonable suspicion to justify the *Terry* stop of Antuna. The court grants the defendant's motion to suppress (Dkt. No. 33). Therefore, the fruits of the search conducted following the unlawful stop, namely the .380 handgun seized from Antuna, is suppressed.

**SO ORDERED**