**UNITED STATES of America**

v.

**Roberto HERNANDEZ–REYES, Defendant.**

**No. EP–07–CR–519–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

June 7, 2007.

Donna Svet Miller, Assistant U.S. Attorney, El Paso, TX, for Plaintiff.

Edgar H. Holguin, Public Defenders Office, El Paso, TX, for Defendant.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

MARTINEZ, District Judge.

On this day, the Court considered Defendant Roberto Hernandez–Reyes's "Motion to Suppress," filed on March 29, 2007; the Government's "Response to Defendant's Motion to Suppress," filed on April 9, 2007; and the testimony and arguments offered at a Suppression Hearing held on May 3, 2007. After careful consideration of the evidence and briefs, the Court is of the opinion that Defendant's Motion to Suppress should be granted in part and denied in part for the reasons that follow.

### I. FINDINGS OF FACT

On February 23, 2007, Border Patrol Agents Curtis Logan, Adrian Lorincz, Fernando Almanza, and Jose Craules (hereinafter referred to collectively as "the Agents") were traveling in an unmarked vehicle westbound near the intersection of Copia and Montana in central El Paso. Agent Logan, the Field Training Officer, was the driver of the vehicle. Agents Lorincz, Almanza, and Craules were all in training, having recently graduated from the Border Patrol academy in December 2006. Agent Lorincz was in the front passenger seat, Agent Almanza was sitting in the second row along with Jose Neri–Gonzalez,[1] and Agent Craules was sitting alone in the third row. The Agents were all wearing their green Border Patrol dress uniforms, and each carried a weapon.

Shortly after Neri–Gonzalez's arrest, the Agents passed Monterrey Business Plaza (the "shopping center"), a shopping center located at one of the north corners of the intersection of Montana and Dallas in central El Paso. Defendant and another individual, Conzumel Hernandez–Sanchez, were washing cars in the parking lot of the shopping center. Agent Logan, the driver of the vehicle, recognized Hernandez–Sanchez as an individual whom he personally had previously apprehended for being in the United States illegally. Agent Logan made a U-turn on Montana and entered the parking lot of the shopping center.

When the Agents initially passed the shopping center, Agent Lorincz had observed various individuals outside the shops, but by the time the Agents turned around and pulled into the shopping center, Defendant and Hernandez–Sanchez were the only individuals in the parking lot or outside in the immediate area. Defendant and Hernandez–Sanchez were about ten feet apart; Defendant was on the south side of the parking lot, to the Agents' left, and Hernandez–Sanchez was on the north side, to the Agents' right. As the Agents pulled into the shopping center, Agent Lorincz saw Defendant look toward the Agents' vehicle, look away quickly, and then begin walking briskly toward the shopping center, crossing in front of the Agents' vehicle.

---

**1.** A few minutes before 2:00 p.m., the Agents apprehended Neri–Gonzalez, an illegal alien walking along Montana Avenue. The Agents arrested Neri–Gonzalez, took him into custody, placed him inside the vehicle, and continued westward on Montana.

After the Agents' vehicle stopped in the parking lot, Agent Lorincz and Agent Almanza exited the vehicle. Agent Lorincz approached Hernandez–Sanchez, and instructed Agent Almanza to speak with Defendant. Agent Lorincz testified that he remembered instructing Agent Almanza to talk to Defendant; Agent Almanza testified that Agent Lorincz told him to "go question that guy [Defendant] before he leaves." Agent Almanza, at the time he exited the vehicle, also believed that Defendant should not be allowed to leave because of Defendant's physical proximity to Hernandez–Sanchez, a person Agent Logan knew had previously been in the United States illegally. Agent Almanza described Defendant as "the other subject" and stated that he was acting upon and following the instructions of Agent Logan.

At the time Agent Almanza approached Defendant, he knew only that Defendant was with a person whom Agent Logan had apprehended previously for being in the United States illegally. At the time he was approached, Defendant was carrying a rag and walking in a direction away from Agent Almanza. Agent Almanza testified that he could not remember what he said to Defendant in order to get his attention, but believes it was something akin to "U.S. Border Patrol, can I speak to you?" Agent Almanza testified that he considered Defendant not free to leave from the moment Agent Almanza began speaking to him, and that had Defendant refused to answer his questions, he would have taken him back to the station.

Agent Almanza initially informed Defendant in English that he was a Border Patrol agent; Defendant looked as if he did not understand Agent Almanza, so Agent Almanza repeated the information in Spanish. Agent Almanza testified that he did not feel safe in the area where he initially spoke to Defendant given the number of vehicles in that area. Agent Almanza told Defendant to put the rag down and asked Defendant to walk with him back to the Agents' vehicle. Agent Lorincz testified that Defendant looked as if he did not want to talk to Agent Almanza.

As Defendant and Agent Almanza began to walk back toward the vehicle, Agent Almanza asked Defendant in Spanish where he was from; Agent Almanza translated Defendant's Spanish response as "the other side."[2] When Agent Almanza and Defendant reached the Agents' vehicle, Agent Almanza asked Defendant if he had any documents that would allow him to be in the United States legally; Defendant replied that he did not. Upon hearing Defendant's response, Agent Almanza searched, handcuffed, and arrested Defendant. It is undisputed that Agent Almanza arrested Defendant without a warrant. The Agents then transported Defendant back to the El Paso Service Processing Center. On March 14, 2007, Defendant was charged in a one-count indictment with illegally reentering the United States, in violation of Title 8, United States Code, Section 1326.

## II. STANDARD

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[3] U.S.

---

**2.** Spanish is Agent Almanza's first language.

**3.** In holding that the Fourth Amendment provided no extraterritorial protection to a Mexican citizen whose home in Mexico was searched by federal agents without a warrant,

the Supreme Court stated that its prior cases "establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this

CONST. amend. IV. Furthermore, the protection of the Fourth Amendment extends beyond the home into a person's automobile and even out to the sidewalk. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) ("[P]eople are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles."). The Fourth Amendment bars only unreasonable searches and seizures. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 877, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Pierre*, 958 F.2d 1304, 1308 (5th Cir.1992). The essential purpose of the Fourth Amendment is to impose a standard of reasonableness upon law enforcement agents. *United States v. Laija–Garcia*, 347 F.Supp.2d 350,

355 (W.D.Tex.2004), *aff'd*, 110 Fed.Appx. 411 (5th Cir.2004). The reasonableness inquiry is driven by a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

 "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v.*

country." *United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). The Fifth Circuit recently declined to decide whether that statement in the *Verdugo–Urquidez* opinion was controlling law, given the statement in Justice Kennedy's concurring opinion: "If the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply," *Verdugo–Urquidez*, 494 U.S. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring). *Martinez–Aguero v. Gonzalez*, 459 F.3d 618, 624 (5th Cir.), *cert. denied*, —— U.S. ——, 127 S.Ct. 837, 166 L.Ed.2d 667 (2006). Prior to the *Verdugo–Urquidez* decision, the Fifth Circuit had "explicitly held [ ] that the Fourth Amendment applies to aliens." *Id.* Because the Government does not argue that Defendant is not entitled to constitutional protections, Defendant was within the United States when he was arrested, Defendant is now subject to the penal laws of the United States, no evidence was presented indicating that Defendant's "connection with the United States is so tenuous that he cannot reasonably expect the protection of its constitutional guarantees," and the Fifth Circuit has not explicitly overruled the application of the Fourth

Amendment to aliens within the United States, the Court will assume that Defendant was entitled to the protections guaranteed by the Constitution on the date of his arrest. *Id.* at 625. Furthermore, the Court is unaware of any case denying a criminal defendant's motion to suppress evidence obtained inside the United States on the grounds that the defendant, as an alien, does not possess rights under the Fourth Amendment. *See, e.g., United States v. Uscanga–Ramirez*, 475 F.3d 1024, 1027 (8th Cir.2007) (affirming district court's denial of motion to suppress filed by a defendant charged with being an illegal alien in possession of a firearm "because of the consent and exigent-circumstances exception to the warrant requirement"); *United States v. Torres–Castro*, 470 F.3d 992, 1000 (10th Cir.2006) (affirming district court's denial of motion to suppress filed by a defendant charged with being an illegal alien in possession of a firearm in part because of the inevitable discovery doctrine); *United States v. Herrera–Ochoa*, 245 F.3d 495, 498 (5th Cir. 2001) (affirming a district court's denial of a motion to suppress an A-file filed by a defendant charged with illegal reentry because the A-file is not suppressible under the fruit of the poisonous tree doctrine).

*Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). In other words, "the police can be said to have seized an individual only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (internal quotation omitted).

■ Non-consensual investigative detentions are constitutionally permissible, provided that the detaining officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Border Patrol agents are authorized "to interrogate any alien or person believed to be an alien regarding his right to be or remain in the United States." 8 U.S.C. § 1357(a)(1); *see* 8 C.F.R. § 287.5(a). However, if an interrogation turns into an investigative detention, federal regulations provide that an investigative detention by an immigration officer must be based on "a reasonable suspicion, based on specific articulable facts, that the person being questioned is ... an alien *illegally* in the United States." 8 C.F.R. § 287.8(b)(2) (emphasis added).

■ "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The movant satisfies his burden by "proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional." *United States v. Waldrop,* 404 F.3d 365, 368 (5th Cir. 2005). However, "warrantless searches and seizures are *per se* unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas,* 9

F.3d 1139, 1147 (5th Cir.1993) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Therefore, "where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *Waldrop,* 404 F.3d at 368. To demonstrate that an encounter was consensual, not a detention, "[t]he government bears the burden of proving that the defendant freely and voluntarily provided the requisite consent." *United States v. Thompson,* 998 F.2d 1017, 1993 WL 272505, at *3 (7th Cir.1993) (citing *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)); *see also United States v. Jones,* 374 F.Supp.2d 143, 149 (D.D.C.2005) (finding that the government had failed to meet its burden of proof that the encounter was consensual). Furthermore, "where the facts are undisputed that the arrest and seizures were made without benefit of warrants of any kind, ... the government bears the burden of proving it had reasonable suspicion to seize [the defendant]." *United States v. Roch,* 5 F.3d 894, 897 (5th Cir.1993). If a court determines that a person's Fourth Amendment rights have been violated, the exclusionary rule provides that any evidence obtained in violation of an individual's Fourth Amendment rights may not be introduced against him at trial. *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## III. ANALYSIS

Agent Almanza clearly had probable cause to arrest Defendant after Defendant admitted that he was from "the other side" and had no documents allowing him to be in the United States legally. *See Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there

is probable cause to believe that a criminal offense has been or is being committed."). Therefore, the Court must decide whether the encounter between Defendant and Agent Almanza before Defendant made the inculpatory statements constituted a seizure for Fourth Amendment purposes. If Defendant was seized at any point before making the inculpatory statements, the Court must decide whether reasonable suspicion was present to warrant the seizure.

### A. Seizure

■■■■■ "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. When determining whether a seizure occurred, the Court must examine "the coercive effect of police conduct, taken as a whole, rather than ... focus on particular details of that conduct in isolation." *Chesternut*, 486 U.S. at 573, 108 S.Ct. 1975.

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (internal citation omitted). "[A] court should take care zealously to guard the rights of citizens freely to give-or to withhold-consent to talk with or be searched by police." *United States v. Berry*, 670 F.2d 583, 596 (5th Cir.1982) (en banc). In considering the totality of the circumstances, the Court concludes, based upon the record, that Defendant was seized from the moment Agent Almanza initially stopped Defendant.

To begin, it was Agent Almanza's intent to prevent Defendant from leaving the parking lot. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. n. 6 ("[T]he subjective intent of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant *except insofar as that may have been conveyed to the respondent.*" (emphasis added)). While Agent Almanza could not recall what he said to Defendant, the Court concludes, based upon Agent Almanza's testimony and demeanor, that the agent's initial words to Defendant were, if not commands to stop, at least made in a commanding tone. This is true especially given both Agent Almanza's belief that his supervising officer did not want Defendant to leave and Defendant's movement in a direction away from the officers. Agent Almanza testified that he usually began encounters with a request to speak to the person, but the Court is mindful of the agent's limited tenure and does not believe that two months' experience demonstrates that Agent Almanza had developed a custom, much less that he followed that custom when approaching Defendant. The Court is also mindful of Agent Almanza's testimony that he instructed Defendant to put down the rag he was holding, and the Court concludes that this was likely interpreted as a command from the agent. Furthermore, Agent Lorincz testified that Defendant looked as if he did not wish to speak to Agent Almanza. While the Court applies an objective test in determining whether a seizure occurred and does not base its finding on the subjective understanding of Defendant, the Court finds that Defendant's decision to speak with Agent Almanza despite exhibiting characteristics indicating that he did not wish to speak to the Agents supports its finding that Agent Almanza's commanding tone

and show of authority placed Defendant in a position such that a reasonable person would not have felt free to leave or end the conversation.

Agent Almanza also testified that he asked Defendant to accompany him back to the Agents' vehicle out of concern for his personal safety. Because Agent Almanza was motivated by concerns for his personal safety, the Court believes it likely that his request, if it was indeed in the form of a request, was at least issued in a commanding tone. In sum, by commanding Defendant to take certain actions, the Court finds that Agent Almanza demonstrated a show of authority that would make a reasonable person feel that he was being detained by the police. *Cf. Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ... as long as the police do not convey a message that compliance with their requests is required." (internal citations omitted)); *Morales v. Taveras,* No. 05–4032, 2007 WL 172392, at *6 (E.D.Pa. Jan. 18, 2007) ("When a police officer in uniform informs a person that she must abide by his orders, any reasonable person would believe that she was not free to leave the scene.").

Additionally, the Court believes that the presence of numerous officers in the immediate vicinity, wearing their dress uniforms and carrying weapons, tips the scales, albeit slightly, toward a conclusion that a reasonable person would not feel free to decline to answer Agent Almanza's questions. *Cf. United States v. Drayton,* 536 U.S. 194, 204, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (noting that the display of a badge did not elevate a challenged encounter to a seizure and that "while neither Lang nor his colleagues were in uniform or visibly armed, those factors should have little weight in the analysis."); *Men-*

*denhall,* 446 U.S. at 555, 100 S.Ct. 1870 (remarking that "[t]he agents wore no uniforms and displayed no weapons" in concluding that no seizure occurred). While only two of the four Agents exited the vehicle, the Court is mindful that the Agents' presence would have been apparent to Defendant through the untinted front windshield of the Agents' vehicle as Defendant crossed in front of the vehicle. Finally, Agent Lorincz arrested and handcuffed Hernandez–Sanchez during the period in which Defendant and Agent Almanza were conversing. "The arrest of one person does not mean that everyone around him has been seized by police." *Drayton,* 536 U.S. at 206, 122 S.Ct. 2105. However, the Court finds that the detention and almost immediate arrest of the only other person present in the parking lot when the Agents stopped their vehicle supports the Court's conclusion that a reasonable person would not have felt free to terminate the encounter with Agent Almanza.

The Government emphasizes the fact that Defendant willingly complied with Agent Almanza's requests and/or demands. However, "acquiescence cannot ... substitute for free consent." *Berry,* 670 F.2d at 597. When considering all of the circumstances, the Court finds that Defendant was seized from the time Agent Almanza initially stopped Defendant. Accordingly, the Court will now consider whether Agent Almanza had reasonable suspicion to detain Defendant.

*B. Reasonable Suspicion*

 The Fifth Circuit has reasoned that the " 'somewhat abstract' and 'elusive' nature of the reasonable suspicion standard makes it impossible to create 'a neat set of legal rules' of what constitutes reasonable suspicion, but this very elusiveness provides courts with the flexibility needed

to make case-specific determinations based on particularized facts." *United States v. Neufeld–Neufeld,* 338 F.3d 374, 378 (5th Cir.2003) (citing *United States v. Arvizu,* 534 U.S. 266, 274–75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). When making reasonable suspicion determinations, a federal court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744. "Reasonable suspicion must be supported by particular and articulable facts, which, [when] taken together with rational inferences from those facts, reasonably warrant an intrusion." *United States v. Michelletti,* 13 F.3d 838, 840 (5th Cir.1994) (en banc). Moreover, the "totality of the circumstances is judged based on what the officer knew before the suspect was detained." *United States v. Antuna,* 186 F.Supp.2d 138, 142 (D.Conn.2002) (citing *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744). Indeed, the totality of the circumstances should reflect the outcome of a process in which officers "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (internal quotation omitted).

██ While Agent Almanza stated at one point during his description of the afternoon's events that he was following Agent Logan's instructions, he never specifically testified that Agent Logan instructed him to seize or arrest Defendant. Accordingly, the Court will consider only what Agent Almanza, as the arresting officer, knew at the time he stopped Defendant. Agent Almanza testified that at that time, he knew only that his field training officer, Agent Logan, recognized Hernandez–Sanchez as a person who he had previously arrested for illegally entering the United States, and that Defendant and

Hernandez–Sanchez were washing cars together in the parking lot. Based upon this information, Agent Almanza believed that Defendant's close physical proximity to and association with Hernandez–Sanchez warranted Defendant's detention. "It is certain one cannot make a search or seizure merely based upon the association or propinquity of a person with known or suspected criminals, or solely because of someone's proximity to contraband." *United States v. Thomas,* 787 F.Supp. 663, 686 (E.D.Tex.1992) (citing *Ybarra v. Illinois,* 444 U.S. 85, 91, 94–96, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Di Re,* 332 U.S. 581, 583–87, 68 S.Ct. 222, 92 L.Ed. 210 (1948)), *aff'd,* 983 F.2d 1062 (5th Cir.1993). The Court does not believe that reasonable suspicion is created solely by a person's physical proximity to a suspected illegal alien or the fact that the person is merely engaged in a common task with the alien. Therefore, the Court concludes that Defendant was seized without reasonable suspicion to justify the detention, and must now decide what evidence should be suppressed as a result.

### C. What Must Be Suppressed

██ "Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *United States v. Dortch,* 199 F.3d 193, 200–01 (5th Cir.1999). Defendant asks the Court to suppress the following evidence: statements made by Defendant before and shortly after his arrest, testimony by the Agents regarding their observations of Defendant in the United States, fingerprints taken from Defendant, and Defendant's A-file.

The Government does not argue that either the inculpatory statements made by Defendant just prior to his arrest or the agents' testimony regarding their observations of Defendant were not a "product" of the unconstitutional seizure. *Id.* at 201. The Court finds that the inculpatory statements were made during the period in which Defendant was seized without reasonable suspicion and in response to Agent Almanza's questioning, and so, the statements must be suppressed. As for the agents' testimony regarding their observations of Defendant's presence in the United States on the day in question, the Court finds that these observations were not the "poisoned fruit" of Agent Almanza's seizure. "The focus is on the causal connection between the illegality and the evidence." *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980). Agent Lorincz and Agent Almanza both observed Defendant in the parking lot before Agent Almanza stopped Defendant. Therefore, the Court cannot conclude that the Agents' testimony regarding their observations of Defendant in the parking lot prior to the detention of Defendant "has been come at by exploitation of [the illegal seizure.]" *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407 (quoting MAGUIRE,

EVIDENCE OF GUILT 221 (1959)). Accordingly, the Court finds that the Agents' testimony that Defendant was in the United States on the date of the arrest is admissible.

Defendant additionally asks the Court to suppress his fingerprints and A-file. "[F]ingerprints taken as part of a routine booking procedure following an arrest later determined to be illegal ordinarily will not be poisoned fruit of an illegal arrest and should not be suppressed."[4] *United States v. Olivares–Rangel*, 458 F.3d 1104, 1114 (10th Cir.2006). The Fifth Circuit has stated in an unpublished opinion that a defendant's argument that his fingerprints and A-file should be suppressed as the fruit of an illegal arrest "is foreclosed by our precedent," citing cases holding that neither the identity nor the A-file of an alien is suppressible evidence. *United States v. Baeza–Castillo*, 72 Fed. Appx. 170, 2003 WL 21976487, at *1 (5th Cir.2003) (citing *United States v. Herrera–Ochoa*, 245 F.3d 495, 498 (5th Cir.2001); *United States v. Roque–Villanueva*, 175 F.3d 345, 346 (5th Cir.1999); *United States v. Pineda–Chinchilla*, 712 F.2d 942, 944 (5th Cir.1983)). Accordingly, the Court now concludes that Defendant's A-file and fingerprints are admissible.[5] *See Herr-*

---

4. "The Supreme Court [has] held that when an illegal arrest was used as an investigatory devise to obtain fingerprints, the fingerprints were regarded as inadmissible fruit of an illegal detention." *Olivares–Rangel*, 458 F.3d at 1114 (citing *Hayes v. Florida*, 470 U.S. 811, 817–18, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); *Davis v. Mississippi*, 394 U.S. 721, 727–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)). Defendant does not argue and the Court does not find that he was detained so that the Agents could obtain his fingerprints. *See id.* at 1114 n. 7 ("In *Davis*, the police obtained the defendant's fingerprints in an attempt to match them to prints found at the scene of a rape. Likewise, in *Hayes* the police detained the defendant specifically to obtain and to compare his fingerprints to finger-

prints found at a crime scene." (internal citation omitted)).

5. Defendant concedes that under current Fifth Circuit law, the A-file is not suppressible under the fruit of the poisonous tree doctrine. *See Roque–Villanueva*, 175 F.3d at 346 ("Even if the defendant was illegally stopped, neither his identity nor INS file are suppressible."). Defendant argues that this result leaves him without a real remedy for the Fourth Amendment violation, and that other courts have allowed the suppression of an illegal alien's A-file. *See United States v. Juarez–Torres*, 441 F.Supp.2d 1108, 1122 (D.N.M.2006) ("If police are free to detain and question anyone they want in order to obtain the person's identity, without fear of the exclusionary rule,

*era–Ochoa*, 245 F.3d at 498 & n. 4 (holding that a district court did not err in refusing to suppress an A-file despite the defendant's illegal arrest "given the binding law in this Circuit that A-files may not be suppressed").

## IV. CONCLUSION

After carefully analyzing the facts of the present case, the Court finds that Agent Almanza impermissibly seized Defendant without reasonable suspicion. However, the Court finds that only Defendant's inculpatory statements are suppressible under the fruit of the poisonous tree doctrine, and that his fingerprints, his A-file, and the testimony of the Agents regarding Defendant's presence in the United States on the date stated in the indictment are all admissible.

Accordingly, **IT IS ORDERED** that Defendant Roberto Hernandez–Reyes's "Motion to Suppress" (Docket No. 15) is **GRANTED IN PART AND DENIED IN PART.**

they may be tempted, even in the absence of reasonable suspicion, to single out people of certain ethnic backgrounds for questioning."). The Court's role, however, is to follow the law of the Fifth Circuit; the Court will not attempt to invite the Fifth Circuit to reconsider the issue on appeal by issuing a decision contrary to current Fifth Circuit law.